[No. 33283-3-II.   Division Two.   May 16, 2006.]

JAY COLBERT, *Individually and as Personal Representative, Appellant*, v. MOOMBA SPORTS, INC., ET AL., *Respondents.*

---

*William S. Bailey* and *C. Steven Fury* (of *Fury Bailey*) and *Philip A. Talmadge* (of *Talmadge Law Group, P.L.L.C.*), for appellant.

*Raymond S. Weber* (of *Mills Meyers Swartling*) and *William R. Hickman* (of *Reed McClure*), for respondents.

¶1 HUNT, J. — Jay Colbert (Colbert) appeals summary judgment dismissal of his action for negligent infliction of emotional distress (NIED) against Skier's Choice, Inc. (SC). Colbert's daughter drowned swimming in a lake after inhaling carbon monoxide while hanging onto the rear of a moving motorboat manufactured by SC. Colbert argues that he suffered emotional distress after seeing rescuers in the distance pull his daughter's body from a lake two to three hours after she drowned. Holding that Colbert has failed to state an actionable claim for NIED, we affirm.

## FACTS

### I. DROWNING

¶2 Shortly after 2:00 AM one summer night, 21-year-old Denise Colbert (Denise)[1] and several friends took a motorboat out on Lake Tapps. Denise had been drinking. SC had manufactured the boat.

¶3 Denise, Matt Holt, Lindsay Lynam, and Kyle Swanson jumped off the boat and started to swim to shore. When they realized the shore was farther away than they had estimated, Marc Jacobi, the boat's owner and driver, moved the boat alongside them and drove slowly toward shore while the swimmers held onto the boat's rear platform.

¶4 When the boat neared 200 yards offshore, Denise and Lynam again began swimming to the shore. Sometime between 3:00 and 3:30 AM, Lynam noticed that Denise had disappeared beneath the water's surface. Lynam, Holt, and Swanson began searching for Denise, and Jacobi called 911. Swanson called Denise's father, Jay Colbert, who was in

---

[1] We refer to Colbert's daughter by her first name for clarity; we intend no disrespect.

bed at the time; Swanson told him that Denise had fallen off the boat and they could not find her in the lake. Colbert took his other children to a neighbor's house and then drove to the lake, which was about a five-minute drive from his neighbor's house.

¶5 Police and other rescuers began arriving around 3:45 AM Colbert and his wife, Kelly Colbert (Denise's step-mother), arrived sometime thereafter. The scene was hectic with ambulances, police officers, and the fire department. Colbert told the rescuers he understood the seriousness of the situation but stated that he had faith in Denise's athletic ability. Colbert and his wife drove to where rescuers were searching with boats, spotlights, and divers. They then left to go to a friend's nearby dock, where they watched the rescuers search the lake.

¶6 Police Chaplain Arthur Sphar traveled back and forth between the rescue site and Colbert's dock vantage point to update him about the search. Later, when Colbert saw the rescue boat begin a search pattern out on the lake, he concluded that the rescuers were looking for Denise in a specific area. Colbert then saw a larger boat and more divers arrive at the scene.

¶7 Sometime after 6:00 AM, rescuers found Denise's body, and Sphar relayed this information to Colbert. About 10 minutes later, Colbert saw a buoy emerge from the water 100 yards (a football field) away, saw rescuers pull a body out of the water onto a boat,[2] and realized that Denise had drowned.

¶8 The rescuers quickly wrapped the body with a blanket, took the wrapped body to the property next to where Colbert stood watching, and placed the body in an ambulance. Colbert returned home.

¶9 The medical examiner reported the cause of Denise's death as drowning. The examiner also noted two other significant conditions, carbon monoxide and ethanol toxic-

---

[2] According to Sphar, they could see a body being pulled from the water, but it was not possible to see identifying detail from Colbert's vantage point on the dock.

ity, which measured at 52 percent saturation and 0.12g/100 ml, respectively.

## II. Father's Response

¶10  Upon learning of Denise's death and seeing her body pulled from the lake, Colbert was, of course, emotionally distressed. He later spoke with Dr. Alligra, some pastors, and friends about his daughter's death. He did not see a psychologist or therapist, except once at his attorney's recommendation on October 22, 2004, when he saw psychologist Dr. Erving Severtson.

¶11  Over the course of four hours, Dr. Severtson interviewed Colbert, gathered information about Colbert's family and history, and administered the Minnesota Multiphasic Personality Inventory 2, a psychological assessment instrument. Dr. Severtson opined that Denise's death caused Colbert's anxiety and depression, which he classified as "reactive." Dr. Severtson believed that (1) Colbert's anxiety was significantly "more marked because he was" at the scene of Denise's drowning but (2) Colbert's emotional distress would have been the same, regardless of whether Colbert had actually seen Denise's body being pulled onto the rescue boat.[3]

---

[3] Dr. Severtson explained:

[T]o see the actual physical recovery, if he did, is adding one more image, so to speak. But you can turn your back and you have a perfect image of what's happening, and you know your daughter, and you know the circumstance and the situation.

  The fact that he was there for that extended period of time made him a very susceptible person to the anxiety, the profound anxiety of the moment, or of the hour.

  . . . .

Seeing it makes it worse. But you are there for a three-hour period, the buoy pops up, and the only thing missing is your actual seeing of that body. To see it, you know, I think would make it worse, but I think you can turn your back and you see it, even though you didn't see it.

3 Clerk's Papers (CP) at 496.

### III. Procedure

¶12 Representing his daughter's estate, Colbert filed an action against Moomba Sports, Inc., United Marine Corp. of Tennessee, and American Marine Skier's Choice Corp. (collectively, SC for Skier's Choice) for negligently failing to warn about carbon monoxide exposure and for negligently designing, manufacturing, developing, assembling, testing, inspecting, selling, supplying, marketing, and promoting the boat on which Denise had been riding on the lake. Colbert claimed the defendants were strictly liable under RCW 7.72.030(2) and for breach of expressed and implied warranty. On October 4, 2004, he amended the complaint, adding his personal claim of NIED against SC.[4]

¶13 The trial court (1) denied Colbert's motion for summary judgment on behalf of Denise's estate; (2) granted SC's motion for partial summary judgment; and (3) dismissed Colbert's claims for breach of warranty, damages for Denise's predeath suffering, and NIED. The estate's product liability claim against SC remained.

¶14 The trial court then (1) denied Colbert's request to certify SC's partial summary judgment for appeal and (2) granted Colbert's motion to dismiss the estate's claims without prejudice. Following voluntary dismissal of the other claims, the only claim remaining in Colbert's lawsuit was his personal NIED claim against SC, which the trial court had previously dismissed on summary judgment.

¶15 Colbert now appeals only the trial court's dismissal his NIED claim.

### ANALYSIS

#### I. Standard of Review

¶16 Summary judgment is appropriate only if the pleadings, affidavits, depositions, and admissions on file demon-

---

[4] Colbert again amended the complaint on February 11, 2005, adding that SC alleged Jacobi was at fault. This amendment, however, has no bearing on the appeal before us.

strate the absence of any genuine issues of material fact and if the moving party is entitled to judgment as a matter of law. *Sheehan v. Cent. Puget Sound Transit Auth.*, 155 Wn.2d 790, 797-98, 123 P.3d 88 (2005). The court must consider all facts submitted and all reasonable inferences from them in the light most favorable to the nonmoving party. *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982).

¶17 We perform the same inquiry as the trial court. The standard of review is de novo. *Berrocal v. Fernandez*, 155 Wn.2d 585, 590, 121 P.3d 82 (2005).

## II. NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

¶18 Colbert argues that he is a "foreseeable" plaintiff, entitled to bring a claim for NIED against the boat manufacturer and distributors, SC, because he arrived shortly after the drowning accident, observed rescuers searching for his daughter, and saw her body being pulled from the lake two to three hours after she drowned. SC counters that Colbert does not qualify as a "foreseeable" NIED plaintiff because (1) he did not witness his daughter suffer or drown; (2) he had been watching fruitless search efforts for two to three hours before he learned that his daughter had drowned and then, 10 minutes later, saw rescuers pull a body from the lake; and (3) his daughter had been dead for some time when he saw finally saw her body, from a distance, only momentarily.

¶19 The tort of NIED is a limited, judicially created cause of action that allows bystander family members to obtain damages for "foreseeable" intangible injuries caused by viewing a physically injured loved one shortly after a traumatic accident. *Hegel v. McMahon*, 136 Wn.2d 122, 125-26, 960 P.2d 424 (1998); *Gain v. Carroll Mill Co.*, 114 Wn.2d 254, 261, 787 P.2d 553 (1990).

¶20 The parties have raised issues that Washington courts have not yet addressed: (1) whether seeing an

injured relative three hours after an accident constitutes "shortly thereafter" under *Gain* and *Hegel* and (2) whether there can be a claim for NIED where the victim dies before the family member arrives at the scene. The critical facts are not in dispute. Rather, the parties dispute (1) whether these undisputed facts are sufficient, as a matter of law, to establish a necessary legal element of a NIED cause of action, namely whether Colbert arrived at the accident scene "shortly after" his daughter's drowning and (2) whether the trial court correctly answered that question "no" as a matter of law.

¶21 We agree with the trial court and hold that the following undisputed facts here do not, as a matter of law, meet the "shortly thereafter" requirement for establishing a bystander relative's cause of action for NIED: First, unlike the usual NIED case, where a family member either witnesses a loved one in an accident or comes upon the scene minutes later and observes the loved one's agonized state, Colbert was not at the scene either to witness Denise's drowning or soon enough thereafter to witness the final seconds of her disappearance under the lake's surface. Instead, he arrived at the accident scene at least 10 to 15 minutes after learning that his daughter had fallen off a boat and disappeared into the lake.

¶22 Second, not only was Denise not visible anywhere when Colbert arrived at the lake, but he also arrived only *after* many rescuers were already present and searching for his missing daughter. Third, before ever laying eyes on his daughter, or her body, Colbert primarily witnessed these rescue workers' futile attempts offshore for several hours. Fourth, by the time Colbert saw the rescuers stop the search, a chaplain had told him that his daughter was dead and that they were recovering her body.

¶23 Fifth, when the rescuers pulled her body from the lake onto the boat, she was a football field away, or about 100 yards, from Colbert's vantage point on the dock, her features were not visible, and the rescuers immediately covered her body with a blanket. Sixth, when the rescuers

brought her body to shore and loaded it onto an ambulance, she was still wrapped in the blanket, her face not visible to Colbert. And finally, the rescue scene, which Colbert viewed from afar, was substantially changed in time and place from where Denise originally had drowned in the lake hours earlier.

¶24 Almost any of these undisputed facts alone would defeat Colbert's claim for NIED; taken together, they clearly do not meet the legal definition of arriving on the accident scene "shortly thereafter" as defined in any previous NIED case in Washington, not even by analogy. In short, the facts here do not as a matter of law create a cognizable cause of action for NIED. Thus, there is no legal or factual issue to send to trial by a jury.[5] We hold, therefore, that the trial court did not err in granting summary judgment dismissal of Colbert's NIED action.

## A. Elements

¶25 To sustain a NIED action, a plaintiff must first prove the four elements of negligence: duty, breach, cause, and damage.[6] But not every negligent act that causes harm results in legal liability for emotional distress. *Hunsley v. Giard*, 87 Wn.2d 424, 434, 553 P.2d 1096 (1976).

¶26 To limit the scope of liability in cases involving bystanders' emotional harm, Washington courts have incorporated requirements used to establish the tort of outrage: a defendant owes a duty to only "foreseeable plaintiffs" and plaintiffs must experience emotional distress with objective

---

[5] *See, e.g. Gain*. In *Gain*, it was undisputed that the plaintiff had not been present at the scene of the accident when or close in time to when the accident occurred. The appellate court determined that the plaintiff's presence at the accident scene was required as a matter of law to sustain a NIED claim. The appellate court, therefore, did not remand to the trial court for a jury to determine whether the plaintiff was at the scene of the accident. Similarly, the trial court here applied the undisputed facts to the law and found them lacking. There are no critical undisputed facts for a jury to resolve. *See Gain*, 114 Wn.2d 254.

[6] These four elements replaced earlier requirements that the plaintiff be within the "zone of danger." *Snyder v. Med. Serv. Corp.*, 145 Wn.2d 233, 243, 35 P.3d 1158 (2001); *Hegel*, 136 Wn.2d at 126.

symptoms. *Hegel*, 136 Wn.2d at 128; *Cunningham v. Lock-ard*, 48 Wn. App. 38, 44, 736 P.2d 305 (1987).

### 1. Duty to "foreseeable plaintiff"

■■ ¶27 Duty is a question of law that relies on mixed considerations of logic, common sense, justice, policy, and precedent. *Snyder v. Med. Serv. Corp.*, 145 Wn.2d 233, 243, 35 P.3d 1158 (2001); *Hunsley*, 87 Wn.2d at 434. A defendant has a duty to avoid inflicting emotional distress to "foreseeable plaintiffs." *Hegel*, 136 Wn.2d at 126. If a defendant negligently causes bodily injury to a person, a foreseeable plaintiff includes the injured person's family members who are physically present at the scene of an accident or who arrive "shortly thereafter." Otherwise, the plaintiff is "unforeseeable" as a matter of law.[7] *Gain*, 114 Wn.2d at 261.

[7] The term "unforeseeable" can be somewhat confusing in the NIED context. In many other types of tort actions, juries are generally charged with determining whether a person is a "foreseeable plaintiff" based on what the defendant knew or should have known under the circumstances and whether a reasonable person under those circumstances should have foreseen the harm. *See, e.g., Seeberger v. Burlington N. R.R.*, 138 Wn.2d 815, 823-24, 982 P.2d 1149 (1999); *Christen v. Lee*, 113 Wn.2d 479, 492, 780 P.2d 1307 (1989).

But in the NIED context, foreseeability is usually determined by courts as a matter of law. Although the *Hunsley* court initially adopted a general rule that juries decide whether a plaintiff is foreseeable, *Hunsley*, 87 Wn.2d at 436-37, 10 years later, we incorporated judicially created limitations, recognizing the virtually unlimited liability that jury-determined foreseeability creates in the NIED context. *Cunningham*, 48 Wn. App. at 44-45. In place of the objective person standard of knowledge, notice, and reasonableness, we set forth specific requirements that a plaintiff must meet in order to be considered "foreseeable" and, thus, in the NIED context. *Cunningham*, 48 Wn. App. at 44-45. Our Supreme Court subsequently adopted, and further defined, most of these *Cunningham* requirements in *Hegel*, 136 Wn.2d at 130, 132, and *Gain*, 114 Wn.2d at 255. Thus, it is settled law in Washington that in the NIED context, foreseeability is not an open-ended question of fact for the jury; rather, it is a question of law for the court.

This concept is not new in tort law. In premises liability actions, for instance, courts have set forth specific requirements that define the defendant's scope of liability instead of simply charging the jury with determining foreseeability based on notice, knowledge, and reasonableness. *See, e.g., Nivens v. 7-11 Hoagy's Corner*, 133 Wn.2d 192, 204-05, 943 P.2d 286 (1997); *Tincani v. Inland Empire Zoological Soc'y*, 124 Wn.2d 121, 128, 875 P.2d 621 (1994); *Hutchins v. 1001 Fourth Ave. Assocs.*, 116 Wn.2d 217, 220, 802 P.2d 1360 (1991).

Of course, juries must still resolve certain necessary foundational facts that allow courts to determine whether duty exists. In the NIED context, for example, juries must still decide such facts as whether a plaintiff is a relative, when the

¶28 Washington first recognized the tort of NIED in *Hunsley*. The defendant drove her car into the back-porch utility room of the plaintiff's home. When the plaintiff stepped into the living room, the floor collapsed. *Hunsley*, 87 Wn.2d at 425. The plaintiff suffered heart damage as a result of severe stress at the time of the accident. *Hunsley*, 87 Wn.2d at 426. The court held that a plaintiff who suffers such mental distress has a cause of action, but this action is limited to foreseeable plaintiffs. *Hunsley*, 87 Wn.2d at 435-36.

¶29 In *Cunningham*, we further addressed the defendant's scope of liability for NIED. The defendant's car struck the plaintiffs' mother as she was walking across a road, causing extensive brain damage. The plaintiffs, the victim's minor children, did not see or hear the accident, and they did not learn about their mother's brain damage until later. *Cunningham*, 48 Wn. App. at 40-41. The children brought an action for NIED. *Cunningham*, 48 Wn. App. at 41. Borrowing limitations from the tort of outrage, we dismissed the plaintiffs' action, holding that NIED is "limited to plaintiffs who are actually *placed in peril* by the defendant's negligent conduct and to *family members present at the time who fear for the one imperiled.*" *Cunningham*, 48 Wn. App. at 45 (emphasis added).

¶30 A few years later, in *Gain*, our Supreme Court approved and incorporated our *Cunningham* NIED rationale. A truck driver struck and killed a Washington State Patrol trooper. That evening, the trooper's father and brother saw the fatal accident on the television evening news. They brought an action for NIED. *Gain*, 114 Wn.2d at 255. The Court held that in order to sustain their action, the plaintiffs had to have been "*physically present* at the scene of the accident or *arrive shortly thereafter.*" *Gain*, 114 Wn.2d at 261 (emphasis added). Otherwise, the defendant

plaintiff arrived at the accident scene, what the plaintiff saw, and how the plaintiff was emotionally affected. Here, however, these foundational facts are essentially undisputed. Thus, based on these undisputed facts, the court determines the scope of liability as a matter of law based on the "foreseeability" and other NIED legal requirements set forth in *Cunningham, Gain,* and *Hegel*.

had no duty to the plaintiffs because they were "unforesee-able as a matter of law." *Gain*, 114 Wn.2d at 261.

¶31 Eight years later, the Supreme Court reiterated its adoption of the *Cunningham* rationale:

> We agree with the Court in *Cunningham*, that unless a reasonable limit on the scope of defendants' liability is imposed, defendants would be subject to potentially unlimited liability to virtually anyone who suffers mental distress caused by the despair anyone suffers upon hearing of the death or injury of a loved one. As one court stated:
>
> > " 'It would surely be an unreasonable burden on all human activity if a defendant who has endangered one person were to be compelled to pay for the lacerated feelings of every other person disturbed by reason of it . . . .' "
>
> *Gain*, 114 Wn.2d at 260 (quoting *Budavari v. Barry*, 176 Cal. App. 3d 849, 855, 222 Cal. Rptr. 446 (1986) (quoting *Scherr v. Hilton Hotels Corp.*, 168 Cal. App. 3d 908, 214 Cal. Rptr. 393 (1985))).

*Hegel*, 136 Wn.2d at 127-28.

## 2. "Immediate aftermath"—*Hegel*

¶32 Further addressing limits of NIED liability, in *Hegel*, our Supreme Court defined "shortly thereafter," the phrase it had used in *Gain*. In one of two consolidated cases, defendant McMahon struck a man, Hegel, who was pouring gasoline into his car parked along the side of a road, knocking him into a ditch. Hegel's family drove along the same road soon after the accident and discovered him lying in a ditch, severely injured, and bleeding from his nose, ears, and mouth. *Hegel*, 136 Wn.2d at 124. Hegel's family sued McMahon, alleging that the sight of Hegel's injured body in the ditch put them in a state of fear and panic, from which they continued to suffer anxiety and shock. *Hegel*, 136 Wn.2d at 124-25.

¶33 In the other case, 19-year-old Marzolf was riding his motorcycle and collided with a school bus. His father came

upon the scene within the next 10 minutes, before emergency crews arrived. Marzolf's father saw his son on the ground, unconscious, his leg cut off, and his body split almost in half; Marzolf died soon after his father arrived. Marzolf's father sued for NIED. *Hegel*, 136 Wn.2d at 125.

¶34 The court rejected the proposition that in order to sustain an action for NIED, a family member must have actually been present when the accident occurred, expanding the time frame to include a time shortly after the accident but before a substantial change occurs:

> [A] family member may recover for emotional distress caused by observing an injured relative at the scene of an accident *after its occurrence* and *before there is substantial change in the relative's condition or location.*

*Hegel*, 136 Wn.2d at 132 (emphasis added).[8] The court recognized a need to "create a rule that acknowledges the shock of seeing a victim *shortly after an accident, without extending a defendant's liability to every relative who grieves for the victim." Hegel*, 136 Wn.2d at 131 (emphasis added). Quoting *Gates v. Richardson*, 719 P.2d 193, 199 (Wyo. 1986), the court noted:

> "The essence of the tort is the shock caused by the perception of an especially horrendous event. . . . The kind of shock the tort requires is the result of the *immediate aftermath* of an accident. It may be the crushed body, the bleeding, the cries of pain, and, in some cases, *the dying words which are really a continuation of the event*. The *immediate aftermath* may be more shocking than the actual impact."

---

[8] To prevent defendants from being subjected to potentially unlimited liability in NIED cases, some jurisdictions have developed more lenient requirements, while others have created far stricter ones. *Compare Beck v. Dep't of Transp. & Pub. Facilities*, 837 P.2d 105 (Alaska 1992) (seeing daughter at hospital after accident is actionable), *and Masaki v. Gen. Motors Corp.*, 71 Haw. 1, 780 P.2d 566 (1989) (learning at hospital that son would never walk again after accident is actionable), *with Fineran v. Pickett*, 465 N.W.2d 662 (Iowa 1991) (plaintiffs discovering victim two minutes after accident is not actionable), *and Cameron v. Pepin*, 610 A.2d 279 (Me. 1992) (defendant liable only if plaintiffs actually witness victim being injured). Washington adopted an intermediate approach in *Hegel*.

*Hegel*, 136 Wn.2d at 130 (emphasis added) (alteration in original). Thus, the Washington court's adoption of the "shortly thereafter" standard appears to be based, in part at least, on Wyoming's *"immediate aftermath"* standard. This standard, in turn, echoes New Mexico's NIED requirement: "contemporaneous sensory perception" of the accident and observation of the injured person *before* emergency professionals arrive. *Gabaldon v. Jay-Bi Prop. Mgmt., Inc.*, 1996-NMSC-55, 122 N.M. 393, 925 P.2d 510, 514.

¶35 In enunciating this rule, our Supreme Court explicitly rejected rigid adherence to a *specific* length of time that passes after an accident, focusing instead on the circumstances under which the plaintiff observes a seriously injured relative. *Hegel*, 136 Wn.2d at 131. Nonetheless, although rejecting a specific time frame, our court has not departed from the basic requirement that the plaintiff's viewing the injured relative must be "shortly thereafter" in the sense of being roughly contemporaneous. *Hegel*, 136 Wn.2d at 132. Thus, whether a plaintiff has an actionable NIED claim depends on what the plaintiff witnessed "shortly after the accident" and the changes in the victim's condition or the scene after the accident.

### 3. No substantial change in accident aftermath

¶36 In *Gabaldon*, the New Mexico Supreme Court considered family-member bystanders' claims for NIED following the injury and near drowning of a boy in a wave pool at a water park. 925 P.2d at 510. His sister was not present at the time and learned about the accident from others. When she went to the scene at least 10 minutes after the accident, she saw paramedics treating her brother. *Gabaldon*, 925 P.2d at 510-11. After having been summoned to the park, the boy's mother arrived at the scene and saw him being transferred into an ambulance, with a mask over his mouth and nose, his eyes rolled back, and his body motionless. Thinking he was dead, she became hysterical. *Gabaldon*, 925 P.2d at 511.

¶37 The New Mexico court established a bright-line rule that family members must "contemporaneously perceive" the accident and observe the injured person *before* emergency professionals arrive in order to sustain an action for NIED. The court focused primarily on the emotional impact of the accident itself on the family members rather than on the impact from seeing emergency professionals attending to the victim. *Gabaldon*, 925 P.2d at 514.

¶38 Although Washington has not adopted New Mexico's bright-line rule, *Gabaldon* illustrates our Supreme Court's purpose behind the rule it announced in *Hegel*: In order to sustain an action for NIED, the "bystander" family members must have arrived at the accident scene "shortly thereafter" but before there is a "substantial change in the victim's condition or location." *Hegel*, 136 Wn.2d at 132. Grafting the rationale from *Gabaldon* onto our Supreme Court's holding in *Hegel*, we hold that to sustain an action for NIED, (1) a plaintiff need not witness a defendant's negligent actions actually harming the victim but (2) a plaintiff must arrive (a) soon enough to observe the accident's immediate aftermath and the accident's effect on the victim and (b) before third parties, such as rescuers and paramedics, have substantially altered the accident scene or the victim's location or condition. Colbert cannot meet this test here.

¶39 The *Gabaldon* plaintiffs did not meet the "contemporaneous sensory perception" or "shortly thereafter" standard when the victim's mother saw him whisked away in an ambulance minutes after the accident and rescuers' attempts to revive him. Clearly, therefore, Colbert, whose contact with his daughter's drowning was far more attenuated, cannot meet the standard either: Colbert's viewing of his daughter's body was farther away, masked by both distance and a blanket covering her; it occurred two to three hours after she drowned and at least 10 minutes after the chaplain told him that she was dead; and Colbert saw her only after significant changes in her location from the invisible spot in the lake where she had drowned earlier, unwitnessed by Colbert.

### 4. Emotional distress with objective symptoms

¶40 To establish a claim for NIED, not only must the plaintiff see the injured victim, but this observation also must cause emotional distress greater than the distress characteristic of learning about the tragic death or injury of a loved one. *Hegel*, 136 Wn.2d at 131, 135.[9] Colbert cannot meet this standard here.

¶41 Even taking the evidence in the light most favorable to him on summary judgment, and even taking into account his understandable shock and terrible grief, Colbert does not show that his emotional distress here was caused by seeing his daughter's body, greater than what he would have suffered from learning of his daughter's death or seeing her body wrapped in a blanket taken away in the ambulance by emergency personnel.

> "The shock of seeing efforts to save the life of an injured spouse in an ambulance or hospital, for example, will not be compensated because it is a life experience that all may expect to endure. The compensable serious emotional distress of a bystander under the tort of negligent infliction of emotional distress is not measured by the acute emotional distress of the loss of the family member. Rather the damages arise from the bystander's observance of the circumstances of the death or serious injury, either when the injury occurs or soon after."

*Gabaldon*, 925 P.2d at 514 (quoting *Bowen v. Lumbermens Mut. Cas. Co.*, 183 Wis. 2d 627, 517 N.W.2d 432, 444-45 (1994)).

¶42 Colbert's physician, Dr. Severtson, stated that (1) "[Colbert's being] there for that extended period of time

---

[9] "Not every act that causes harm results in legal liability." *Hunsley*, 87 Wn.2d at 434.

The challenge is to create a rule that acknowledges the shock of seeing a victim shortly after an accident, without extending a defendant's liability to every relative who grieves for the victim. . . . An appropriate rule should not be based on temporal limitations, but should differentiate between the trauma suffered by a family member who views an accident or its aftermath, and the grief suffered by anyone upon discovering that a relative has been severely injured.

*Hegel*, 136 Wn.2d at 131 (citation omitted).

made him a very susceptible person to the anxiety, the profound anxiety of the moment, or of the hour";[10] (2) simply being at the scene of the accident triggered Colbert's emotional distress; (3) Colbert would have suffered the same emotional distress, regardless of whether he had seen his daughter's body; and (4) even if Colbert had not seen his daughter's body, he would have created a mental image of the body.

> Courts and commentators universally agree that the tort of bystander NIED is not available to compensate the grief and despair to loved ones that invariably attend nearly every accidental death or serious injury.

*Gabaldon*, 925 P.2d at 513. Thus, even if Colbert's action had survived summary judgment on the other elements of NIED, it would not have survived on the distress-causation element.

## B. Colbert's NIED Action

¶43 Applying this rule here, Colbert fails to meet the necessary requirements to sustain his NIED action. He drove to the accident scene after Swanson informed him that Denise had fallen off the boat. When Colbert arrived, rescuers were already in the water searching for his daughter. Colbert continued watching for three hours, realizing at one point that the rescuers had identified an area on the lake where his daughter was likely located. Colbert later saw a buoy emerge from the water, heard that the rescuers had discovered his daughter's body, and then watched as rescuers pulled the body out of the water 100 yards away,[11]

---

[10] 3 CP at 496.

[11] Colbert indicated that he saw his daughter's body from 100 yards away, which is roughly the size of a football field. According to Sphar, this distance was too great to see any facial or other identifying body details. Most bystander NIED cases involve plaintiffs who have seen family members in relatively close proximity such that, in *Hegel*, for example, the plaintiff suffered emotional distress from the shock of witnessing such excruciating details as the crushed body, bleeding, and obvious agony of the injured loved one.

which according to Sphar was too far away to make out identifying facial and body details.

¶44 Colbert unquestionably experienced a horrible tragedy, but he did not make the type of observations under circumstances described in *Hegel* as necessary to sustain a bystander relative's action for NIED. First, although Colbert arrived at the scene of the accident shortly after (around 10 minutes) it occurred, he did not see or hear his daughter drown. Nor did he see her upon his arrival. Instead, for two to three hours he witnessed rescue efforts by others in or diving from boats on the lake's surface some distance away.

¶45 Second, Colbert learned of his daughter's death about 10 minutes before the rescuers pulled her body from the lake. The chaplain had come over to the dock where Colbert had been watching to tell him the sad news.

¶46 Third, when Colbert finally saw the body, he saw it only from a distance,[12] after rescuers had pulled it from its hidden location at the bottom of the lake. Then he watched rescuers remove the body from the lake, place it onto a boat, immediately wrap the body in a blanket, bring it back to shore, and then take the wrapped body away in an ambulance. Colbert did not see his daughter's body up close after the accident, as is usual for NIED claims. And when he did see her body, it was only briefly, from a distance, after rescuers had substantially changed her location, removed her body from the accident scene (the bottom of the lake), and wrapped the body in a blanket. Colbert did not witness the immediate aftermath of the drowning. And he never saw the accident scene or his daughter's body substantially

---

[12] We do not attempt to establish a required physical proximity between the injured victim and the witnessing family member for purposes of NIED. Rather, we note simply that the distance must be close enough for the plaintiff to experience traumatic shock from a close-up view of the loved one's agonizing injuries and, under the undisputed facts here, that distance—100 yards—was clearly too great.

unaltered by third-party involvement,[13] which, again, distinguishes the facts here from other NIED cases.

¶47 Had the trial court allowed Colbert's NIED claim to go forward, such action would have been contrary to the *Hegel* rule that plaintiffs must arrive "shortly after" an accident. As the Wisconsin and New Mexico Supreme Courts explain,

> "The tort of negligent infliction of emotional distress compensates plaintiffs whose natural shock and grief upon the death or severe physical injury of a spouse, parent, child, grandparent, grandchild, or sibling are compounded by the circumstances under which they learn of the serious injury or death. This tort reflects, for example, the intensity of emotional distress that can result from seeing the incident causing the serious injury or death first hand or from coming upon the gruesome scene minutes later."
>
> " . . . .
>
> " . . . The distinction between on the one hand witnessing the incident or the gruesome aftermath of a serious accident minutes after it occurs and on the other hand the experience of learning of the family member's death through indirect means is an appropriate place to draw the line between recoverable and non-recoverable claims."

*Gabaldon*, 925 P.2d at 514 (quoting *Bowen*, 517 N.W.2d at 444-45).

¶48 Lastly, Colbert did not "unwittingly" arrive at the accident scene, which other jurisdictions have required for a bystander family member to sustain a NIED claim. *See, e.g., Mazzagatti v. Everingham*, 512 Pa. 266, 516 A.2d 672 (1986); *Nat'l County Mut. Fire Ins. Co. v. Howard*, 749 S.W.2d 618 (Tex. 1988). In *Hegel*, the plaintiffs happened upon the accident scenes immediately afterward and observed their seriously injured relatives, without prior warning or an opportunity to prepare. *Hegel*, 136 Wn.2d at

---

[13] In *Hegel*, the court mentioned a plaintiff's perceiving such sensory-dependent details as the crushed body, bleeding, and cries of pain, details not present here. Neither party here, however, argued whether seeing the victim's body, undamaged superficially, is sufficient to bring an action for emotional distress; thus, we do not address this issue.

124-25. Colbert, on the hand, knew before he left home that his daughter had "fallen off" a boat in the lake and could not be located. And when he arrived at the lake, the accident scene was not readily apparent and his daughter was not visible. Instead, Colbert watched third parties search for hours before seeing rescuers remove his daughter's body from the lake.

¶49 We agree with the trial court that Colbert failed to show that defendant SC owed him a duty of care. Therefore, we affirm the trial court's summary judgment dismissal of his action for negligent infliction of emotional distress against SC.[14]

¶50 Affirmed.

BRIDGEWATER and PENOYAR, JJ., concur.

---

[14] Because this issue is dispositive, we do not address the remaining issues, such as whether a victim must be alive when a plaintiff arrives at the scene of the accident. Obviously, however, that Denise had been dead for hours did not preclude our consideration of Colbert's NIED claim.