[No. 78833-2. En Banc.]
Argued May 15, 2007. Decided February 14, 2008.

JAY COLBERT, *Individually and as Personal Representative, Petitioner*, v. MOOMBA SPORTS, INC., ET AL., *Respondents*.

*William S. Bailey* and *C. Steven Fury* (of *Fury Bailey*) and *Philip A. Talmadge* (of *Talmadge Law Group, PLLC*), for petitioner.

*William R. Hickman* (of *Reed McClure*) and *Raymond S. Weber* (of *Mills Meyers Swartling*), for respondents.

*Bryan P. Harnetiaux* on behalf of Washington State Trial Lawyers Association Foundation, amicus curiae.

¶1 MADSEN, J. — Jay Colbert's daughter, Denise Colbert, drowned after inhaling carbon monoxide fumes while hanging onto a motorboat as it was moving. He sued the boat manufacturer and others on several theories, including failure to warn of the danger of carbon monoxide exposure and negligent infliction of emotional distress. The trial court granted summary judgment in favor of the defendants and the Court of Appeals affirmed. Mr. Colbert maintains that the Court of Appeals improperly imposed additional requirements for bringing a claim of negligent infliction of emotional distress beyond those established by this court and that the Court of Appeals erred in holding that he failed to present sufficient evidence of emotional distress. We agree that the Court of Appeals improperly adopted a requirement that would alter Washington law, but we nevertheless affirm because summary judgment was properly granted in favor of the defendants.

## FACTS

¶2 According to Mr. Colbert, at about 3:00 AM on August 3, 2003, he and his wife, Kelly, were awakened by a telephone call from Kyle Swanson, the boyfriend of Mr. Colbert's daughter, Denise. Mr. Swanson was quite upset. He told them that Denise had disappeared from the back of a boat at Lake Tapps and a search was taking place for her. At about 1:30 AM Denise Colbert and others had gone for a boat ride aboard Marc Jacobi's boat. Ms. Colbert and a friend were in the water holding on to the swimmers platform at the rear of the boat as it headed toward shore.[1] After an hour and a half in the water, they decided to go swimming, and, as her friend stated, "[a]ll of a sudden she was gone. We were just swimming, and then she went under. There wasn't a struggle or anything." Clerk's Papers at 265 (Dep. of Lindsay Lynam at 39). Mr. Swanson and others searched for Denise and Mr. Jacobi called 911; the call was received at 2:58 AM.

¶3 A short time later Kyle Swanson called Mr. Colbert, who took his other children to a neighbor's house and then drove to the lake, about five minutes from their home. When he arrived, police cars, ambulances, and the fire department were at the scene. Mr. Colbert saw lights flashing from a boat on the water and knew the search for his daughter was underway. He drove to a friend's house on the lake and watched the rescue operation from the friend's dock. He hoped Denise would be found alive because Denise was an outstanding athlete with stamina and endurance, and she was a strong swimmer. Police Chaplain Arthur Sphar traveled back and forth between the rescue site and the dock to update Mr. Colbert about the search.

¶4 At some point after 6:00 AM rescuers found Denise's body. Sphar relayed this to Mr. Colbert. About 10 minutes

---

[1] Neither wore a life jacket. There was a placard on the stern prohibiting people from being on or near the swim platform when the engine was running, but Mr. Jacobi did not take steps to move Ms. Colbert and her friend.

later Mr. Colbert saw a buoy pop to the lake's surface. Because he could hear the dialogue from rescue workers on the lake he knew what this meant—it was tied to Denise's body. Mr. Colbert watched rescue boats move alongside the buoy. He saw Denise's body pulled over the side of a boat by her arm. He averred that he could see rescue workers move Denise's body once it was on the boat from about 100 yards away on the dock from which he watched. Mr. Colbert explains it was light enough that he could see this activity. Mr. Colbert saw an ambulance by the water and watched the police bring a stretcher, put a sheet over Denise's body, and take her away. He testified at a deposition that he was able to recognize the body as Denise's. Chaplain Sphar said they could see a body being pulled from the lake, but added it was not possible to see identifying detail from the dock. Denise had died about three hours before her body was recovered from the water. The cause of Ms. Colbert's death was "drowning" with "ethanol toxicity" and "carbon monoxide" noted as significant. Her blood alcohol level was 0.12 g/100 ml.

¶5 On December 2, 2003, acting as the personal representative of Denise's estate, Mr. Colbert sued Moomba Sports, Inc., United Marine, American Marine, and Skier's Choice, Inc. (collectively Skier's Choice), alleging negligence in failing to warn about carbon monoxide exposure and in designing, manufacturing, developing, assembling, testing, inspecting, selling, supplying, marketing, and promoting the boat Denise had been hanging on to; strict product liability under Washington's product liability act, chapter 7.72 RCW; and breach of expressed and implied warranty.[2] On October 4, 2004, plaintiff filed a first amended complaint adding a claim on his own behalf of negligent infliction of emotional distress. In brief, Mr. Colbert contends that Skier's Choice is at fault in his daughter's death because of the design and manufacture of the boat and Skier's Choice's failure to warn boat owners

---

[2] Mr. Jacobi, the boat owner, was later added as a defendant.

and users of the risk of carbon monoxide. He argues that Denise received a lethal dose of carbon monoxide from the boat, causing her to drown.

¶6 On November 1, 2004, Mr. Colbert filed a motion for partial summary judgment, seeking a ruling that the boat was not reasonably safe due to lack of adequate warnings. The trial court denied the motion. Skier's Choice then moved for partial summary judgment, arguing, among other things, that as a matter of law Colbert failed to state an actionable claim for negligent infliction of emotional distress. The trial court granted Skier's Choice's motion.

¶7 The trial court reasoned:

> [T]he crux of the emotional distress is that you have to be present within a short period of time to view the victim's suffering. That doesn't apply here. If I were to deny the motion I would be extending this out to any parent who is called and told their child has been in an automobile accident and has been taken to a hospital. The child might have been rescued from a drowning incident but still alive but in a coma, they go to the hospital and you could then say they're having emotional distress because they had to sit and watch their child die within three hours or five hours or what have you . . . . The way the law is worded right now Mr. Colbert is not covered for emotional distress. He was called, went there, already advised she'd gone off the boat into the water and must have known it was a high probability she would have drowned. Watched the recovery effort for three hours but did not witness any pain, suffering or the like. A parent is going to be devastated any time their child dies before they do . . . . But this case is outside the parameters of the law as it is now.

Verbatim Report of Proceedings (Apr. 22 and May 20, 2005) at 14-15.

¶8 Colbert moved for voluntary dismissal of the estate's claims against Skier's Choice without prejudice; the trial court granted the motion. Mr. Colbert then appealed dismissal of the claim of negligent infliction of emotional distress. The Court of Appeals affirmed.

## ANALYSIS

¶9 Neither Mr. Colbert nor Skier's Choice asks the court to change Washington law respecting the judicially created tort of negligent infliction of emotional distress. Each party reasons that current law favors his or her position as to whether summary judgment was proper. Mr. Colbert claims, however, that the Court of Appeals altered Washington standards for what is required and imposed new requirements in reliance on out-of-state authority that permits a claim only if the plaintiff actually witnesses the traumatic event, arrives at the scene before any emergency personnel arrive, and arrives at the scene "unwittingly."

¶10 The tort of negligent infliction of emotional distress is a limited, judicially created cause of action that allows a family member a recovery for "foreseeable" intangible injuries caused by viewing a physically injured loved one shortly after a traumatic accident. *Hegel v. McMahon*, 136 Wn.2d 122, 125-26, 960 P.2d 424 (1998); *Gain v. Carroll Mill Co.*, 114 Wn.2d 254, 261, 787 P.2d 553 (1990). We have recognized that other courts have applied numerous, widely varying standards for determining whether and when a defendant will be liable for negligent infliction of emotional distress. *E.g.*, *Hegel*, 136 Wn.2d at 131-32; *Hunsley v. Giard*, 87 Wn.2d 424, 434, 553 P.2d 1096 (1976). *See generally* Dale Joseph Gilsinger, *Recovery under State Law for Negligent Infliction of Emotional Distress under Rule of* Dillon v. Legg, 68 Cal. 2d 728, 69 Cal. Rptr. 72, 441 P.2d 912 (1968), *or Refinements Thereof*, 96 A.L.R.5TH 107 (2002); Dale Joseph Gilsinger, *Recovery under State Law for Negligent Infliction of Emotional Distress Due to Witnessing Injury to Another Where Bystander Plaintiff Must Suffer Physical Impact or Be in Zone of Danger*, 89 A.L.R.5th 255 (2001); Michael Jay Gorback, Note, *Negligent Infliction of Emotional Distress: Has the Legislative Response to Diane Whipple's Death Rendered the Hard-line Stance of* Elden *and* Thing *Obsolete?*, 54 HASTINGS L.J. 273

(2002) (chronicling changes in California law); Jeffrey Hoskins, Comment, *Negligent Infliction of Emotional Distress: Recovery is Foreseeable*, 39 J. Marshall L. Rev. 1019 (2006); Paul V. Calandrella, Note, *Safe Haven for a Troubled Tort: A Return to the Zone of Danger for the Negligent Infliction of Emotional Distress*, 26 Suffolk U. L. Rev. 79 (1992).

¶11 However, once this court decided *Hegel*, the principles that apply under Washington law were generally established. "Bystander negligent infliction of emotional distress claims involve emotional trauma resulting from one person's observation or discovery of another's negligently inflicted physical injury." *Hegel*, 136 Wn.2d at 125-26. The class of bystander plaintiffs is restricted to those who were present at the scene of the accident, *id.* at 126; *Gain*, 114 Wn.2d at 260, and the plaintiff must demonstrate objective symptoms of emotional injury. *Hegel*, 136 Wn.2d at 126; *Hunsley*, 87 Wn.2d at 436.

¶12 What is required for "presence at the scene of the accident" has evolved under Washington law. The bystander negligent infliction of emotional distress claim was first recognized in Washington in *Hunsley*, where the defendant negligently drove a car into the plaintiff's house. Although there was no physical impact to the plaintiff and the accident occurred outside her presence, she experienced heart trouble after the accident that was later diagnosed as having resulted from severe mental stress. *Hunsley*, 87 Wn.2d at 425-26. The court in *Hunsley* abandoned the previous requirement that the plaintiff must be in the zone of danger before recovery could be had, and instead evaluated the plaintiff's claim under the general tort principles of duty, breach, proximate cause, and damage or injury. *Id.* at 434. The court determined that if the specific harm that the plaintiff alleged was foreseeable to the defendant, then the defendant had a duty to avoid it and he could be liable for failing to adhere to his duty of care. *Id.* at 434-35.

¶13 Subsequently, as explained in *Hegel*, 136 Wn.2d at 126, the Court of Appeals concluded that *Hunsley*'s "fore-

seeability" limitation on liability was contrary to public policy. *Cunningham v. Lockard*, 48 Wn. App. 38, 736 P.2d 305 (1987). In *Cunningham*, a car struck the plaintiffs' (minor childrens') mother, but they did not see the accident nor did they come on the scene of the accident shortly after its occurrence. The Court of Appeals recognized the rule of *Hunsley* that one has a duty not to negligently inflict emotional distress on another, and that this rule was limited in *Hunsley* only by the principle that the defendant's duty is owed to those foreseeably endangered by the negligent conduct and only as to the particular risks or hazards the likelihood of which made the defendant's conduct unreasonably dangerous. *Id.* at 43 (quoting *Hunsley*, 87 Wn.2d at 436 (quoting *Rodrigues v. State*, 52 Haw. 156, 174, 472 P.2d 509 (1970))).

¶14 The Court of Appeals in *Cunningham* noted that not every act that causes harm results in legal liability and that proximate causation has two elements: cause in fact and legal causation. *Id.* at 44 (citing *Hartley v. State*, 103 Wn.2d 768, 777, 698 P.2d 77 (1985)). Legal causation involves a determination of whether liability should attach given cause in fact and is a question of law for the court based on policy considerations as to how far the consequences of the defendant's act should go. *Id.* (citing *Hartley*, 103 Wn.2d at 779). The Court of Appeals said that in *Hunsley* this court had not decided the scope of legal liability, and therefore the opinion subjected defendants to potentially unlimited liability to virtually anyone who suffered physical manifestation of emotional distress caused either by "personal peril" or "concern for the peril of another." *Id.* Accordingly, the Court of Appeals felt it necessary that a boundary must be drawn establishing the class of people who can sue. *Id.* Drawing from the tort of outrage, the Court of Appeals reasoned that for policy reasons the class of plaintiffs who can bring a claim of negligent infliction of emotional distress includes only those "plaintiffs who are actually placed in peril by the defendant's negligent conduct and . . . family members present at the time who fear for the one imperiled." *Id.* at 44-45.

¶15 The Court of Appeals thus placed a limitation on the tort claim that we had not. However, the next significant step came in *Gain*, where the issue was whether the plaintiff had to be physically present at the scene of the accident. In *Gain* we acknowledged, as the Court of Appeals had in *Cunningham*, that *Hunsley*'s foreseeability approach could allow for an overly expansive allocation of fault. We stated:

> We agree with the court in *Cunningham*, that unless a reasonable limit on the scope of defendants' liability is imposed, defendants would be subject to potentially unlimited liability to virtually anyone who suffers mental distress caused by the despair anyone suffers upon hearing of the death or injury of a loved one. As one court stated:
>
> > " 'It would surely be an unreasonable burden on all human activity if a defendant who has endangered one person were to be compelled to pay for the lacerated feelings of every other person disturbed by reason of it. . . .' "
>
> *Budavari v. Barry*, 176 Cal. App. 3d 849, 855, 222 Cal. Rptr. 446 (1986) (quoting *Scherr v. Hilton Hotels Corp.*, 168 Cal. App. 3d 908, 214 Cal. Rptr. 393 (1985)).

*Gain*, 114 Wn.2d at 260 (alteration in original).

¶16 Accordingly, we concluded in *Gain* that "mental suffering by a relative who is *not present at the scene* of the injury-causing event *is unforeseeable as a matter of law*. We reach this conclusion after balancing the interest of the injured party to compensation against the view that a negligent act should have some end to its legal consequences." *Id.* (emphasis added).

¶17 We therefore held that as a matter of law the plaintiffs in *Gain*, who were family members of a state trooper killed by a truck and who saw film relating to the fatal accident on television, had no claim for negligent infliction of emotional distress. We left open the possibility that a claim would be recognized if plaintiffs arrived shortly after an accident where a family member was injured, explaining that a defendant's duty to avoid infliction of emotional distress

does not extend to those plaintiffs who have a claim for mental distress caused by the negligent bodily injury of a family member, unless they are physically present at the scene of the accident or arrive shortly thereafter. Mental distress where the plaintiffs are not present at the scene of the accident and/or arrive shortly thereafter is unforeseeable as a matter of law.

*Id.* at 261. We recognized in *Gain* that limits must be placed on the foreseeability standard, and explicitly declined to apply ordinary tort principles. We did not, however, adopt the particular limitation espoused by the *Cunningham* court, i.e., that a plaintiff must always be physically present at the time of the accident. Rather, we considered that a plaintiff who is not present at the time the accident occurs but arrives "shortly thereafter" may be a foreseeable plaintiff.

¶18 Next, in *Hegel*, we addressed the meaning of the phrase "shortly thereafter." *Hegel* involved consolidated cases. In one, following an accident leaving the victim lying in a ditch severely injured and bleeding, his relatives, plaintiffs, discovered him when they drove along the same road shortly after the accident. In the other case, the victim was killed when his motorcycle collided with a school bus. His father, the plaintiff, happened on the scene within 10 minutes, before emergency crews arrived, and saw his son still conscious but with his leg cut off and other severe injury leading to his death soon afterward.

¶19 We said:

Gain does not limit negligent infliction of emotional distress claims to those who actually witness the injury-causing event . . . .

We will not ignore the "shortly thereafter" language in *Gain*. Prior to *Gain*, negligent infliction of emotional distress claims were limited only by general tort principles . . . . *Gain* narrowed the cause of action by requiring a plaintiff to be present at the accident scene in order to recover. *Gain* did not further restrict liability by mandating that the plaintiff be present *at the time* of the accident, nor did it foreclose a cause of action for a

plaintiff who arrives on the scene after the accident has occurred and *witnesses the victim's suffering*.

*Hegel*, 136 Wn.2d at 129-30 (second emphasis added).

¶20 *Hegel* thus confirmed the position we took in *Gain*, that ordinary principles of negligence will not determine liability. Instead of a limitation based only on general tort principles, we reiterated the principle that a bystander claim for negligent infliction of emotional distress is a limited tort theory of recovery.

¶21 We also observed in *Hegel* that while a bright line rule limiting recovery "to those who witnessed the accident is attractive in its simplicity . . . it draws an arbitrary line that serves to exclude plaintiffs without meaningful distinction." *Id*. at 130. The tort of negligent infliction of emotional distress rests on the fact the plaintiff suffers emotional trauma stemming not only from

> witnessing the transition from health to injury, but also from witnessing the aftermath of an accident in all its alarming detail. The Wyoming Supreme Court explained in *Gates v. Richardson*, 719 P.2d [193,] 199 [(Wyo. 1986)]:
>
>> The essence of the tort is *the shock caused by the perception of an especially horrendous event*. . . . The kind of shock the tort requires is the *result of the immediate aftermath of an accident*. It may be *the crushed body, the bleeding, the cries of pain, and, in some cases, the dying words* which are really a continuation of the event. The immediate aftermath may be more shocking than the *actual impact*.

*Id*. (emphasis added) (third alteration in original).

¶22 Accordingly, in deciding the scope of the tort, we sought to identify a rule that permitted recovery for those who suffer emotional distress because they personally experienced the immediate aftermath of an accident that is in reality a continuation of the event. We identified the proper scope of the phrase "shortly thereafter," by recognizing first that "[a]n appropriate rule *should not be based on temporal limitations*, but should differentiate between the trauma suffered by a family member who views an accident or its aftermath, and the grief suffered by anyone upon discover-

ing that a relative has been severely injured." *Id.* at 131 (emphasis added). We analogized to diagnosing those suffering from "posttraumatic stress disorder, [where the] traumatic event is one where a person experiences or witnesses actual or threatened physical injury or death, and has a response that involves '*intense fear, helplessness, or horror.*'" *Id.* at 131 n.2 (emphasis added) (quoting AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 428 (4th ed. 1994)). Although we acknowledged that courts in other jurisdictions have adopted a wide spectrum of rules to define liability for negligent infliction of emotional distress, we adopted the "principled intermediate approach" of the Connecticut and Wyoming courts. *Hegel,* 136 Wn.2d at 131.

¶23 We concluded that in Washington a cause of action for negligent infliction of emotional distress is recognized "where a plaintiff witnesses the victim's injuries at the scene of an accident shortly after it occurs and before there is a material change in the attendant circumstances." *Id.* at 132 (citing *Clohessy v. Bachelor,* 237 Conn. 31, 675 A.2d 852 (1996); *Gates,* 719 P.2d 193). In these circumstances, the plaintiff's emotional distress results from the shock caused by the personal experience in the immediate aftermath of an especially horrendous event of seeing the victim, surrounding circumstances, and effects of the accident as it actually occurred.

¶24 A plaintiff cannot recover if he or she did not witness the accident and did not arrive shortly thereafter, meaning that he or she did not see the accident or the horrendous attendant circumstances such as bleeding or other symptoms of injury, the victim's cries of pain, and, in some cases, the victim's dying words, all of which would constitute a continuation of the event. Emotional distress from such circumstances is not the same as the emotional distress that will arise whenever a person knows a loved one is suffering but does not personally see that suffering or the injuries at the scene before there is a material change. It is not the same as the emotional distress that a person suffers after learning of the suffering of the victim from others who

were present but does not personally see the injuries or the aftermath of the accident before there is a material change. There must be actual sensory experience of the pain and suffering of the victim—personal experience of the horror.

¶25 In this case, the Court of Appeals determined that as a matter of law Mr. Colbert was not a foreseeable plaintiff entitled to bring a claim for negligent infliction of emotional distress, there was no factual issue to send to the jury, and the trial court did not err in granting summary judgment dismissing the negligent infliction of emotional distress claim. *Colbert v. Moomba Sports, Inc.*, 132 Wn. App. 916, 925, 135 P.3d 485 (2006). The Court of Appeals reasoned that the trial court had correctly held that undisputed facts did not, as a matter of law, meet the "shortly thereafter" requirement. Among other things, the Court of Appeals noted that unlike the "usual case" where the family member witnesses a loved one in an accident or comes on the scene moments later and observes the loved one's agonized state, Mr. Colbert was not at the scene to witness his daughter's drowning or to see her final minutes before she disappeared. Instead, he arrived only after many rescuers were already present and searching. In addition, he did not arrive "unwittingly"—he already knew about the accident before he arrived. *Id.* at 935-36.

¶26 First, Mr. Colbert maintains that foreseeability is a jury question. However, the presence of the plaintiff at the scene or "shortly thereafter" is a prerequisite to finding foreseeability of mental suffering by the plaintiff. *Gain*, 114 Wn.2d at 260. If the plaintiff is not present at the time of the accident and does not arrive on the scene shortly thereafter, foreseeability is lacking *as a matter of law* and there is no question to send to the jury on the question of foreseeability. *Id.* Lacking foreseeability, there is no duty on the defendant's part to avoid inflicting emotional distress. Similarly, in *Hegel* we held that it was improper for the lower courts to dismiss the plaintiffs' claims for negligent infliction of emotional distress where they were present at the scenes of the accidents and may have witnessed their

family members' suffering before there was a substantial change in the victims' conditions or locations. *Hegel*, 136 Wn.2d at 132. We said the plaintiffs' mental distress was not unforeseeable as a matter of law. *Id.*

¶27 Contrary to Mr. Colbert's argument, ordinary tort principles respecting foreseeability do not apply. A bystander claim for negligent infliction of emotional distress is a *limited* cause of action, not subject to ordinary tort principles, as we held in *Gain* and confirmed in *Hegel*. *See Hegel*, 136 Wn.2d at 129-30. We have deliberately adopted a limited view of foreseeability in this context. Under our decision in *Gain*, if Colbert was not present at the time of the accident and did not arrive shortly thereafter, as that term has been defined in case law, he was *not a foreseeable plaintiff as a matter of law*. Applying *Hegel*'s definition of "shortly thereafter" to these facts, because Colbert did not observe his daughter at the scene of the accident after its occurrence and before there were material changes in her condition, or the scene, or both, he did not arrive "shortly thereafter" as that term has meaning.

¶28 When Mr. Colbert arrived, the accident had already occurred—he did not observe his daughter's suffering or her condition while she was drowning. Although he may have arrived within a chronologically short time of her death, at no time did he personally experience conditions that can be said to be a continuation of " 'an *especially horrendous event*' " involving conditions analogous to seeing a " '*crushed body* [or] *bleeding*' " or hearing " 'cries of pain [or] dying words.' " *Id.* at 130 (emphasis added) (quoting *Gates*, 719 P.2d at 199).

¶29 We do not doubt Mr. Colbert's distress at the loss of his daughter or that he underwent a terrible trial while waiting for divers to locate and recover his daughter's body. But he simply did not experience conditions that are comparable to actually witnessing a loved one's accidental death or serious injuries.

¶30 Accordingly, the Court of Appeals did not err in holding that Mr. Colbert was not a foreseeable plaintiff as a matter of law.

■■ ¶31 Mr. Colbert contends, however, that the Court of Appeals erroneously requires a plaintiff to have a closeup view of the loved one's injuries. The Court of Appeals addressed the fact that when Mr. Colbert finally saw his daughter's body it was from a distance. The court said it would not attempt to establish a required physical proximity between the injured victim and the witnessing family member but noted that "the distance must be close enough for the plaintiff to experience traumatic shock from a close-up view of the loved one's agonizing injuries and, under the undisputed facts here, that distance—100 yards—was clearly too great." *Colbert*, 132 Wn. App. at 934 n.12. Colbert insists that in *Hegel* the court refused a bright line rule requiring that the plaintiff witness the actual event, instead permitting a claim where the plaintiff arrives at the scene shortly thereafter. Mr. Colbert says that the Court of Appeals implies the plaintiff must actually witness trauma to the victim or the victim's suffering. Colbert maintains that under Washington law, there is no requirement that the plaintiff witness the loved one's suffering or physical trauma in order to recover for negligent infliction of emotional distress.

¶32 In *Hegel* we declined to require the plaintiff to be present at the time of the accident. As explained, we said in *Hegel* that *Gain* did not "foreclose a cause of action for a plaintiff who arrives on the scene after the accident has occurred and *witnesses the victim's suffering*." *Hegel*, 136 Wn.2d at 130 (emphasis added). The cause of action is recognized "where a plaintiff *witnesses the victim's injuries* at the scene of an accident shortly after it occurs and before there is material change in the attendant circumstances." *Id.* at 132 (emphasis added). We held that "a family member may recover for emotional distress *caused by observing an injured relative at the scene of an accident* after its occurrence and before there is substantial change in the relative's condition or location." *Id.* (emphasis added).

¶33 Contrary to Mr. Colbert's argument, *Hegel does* require the plaintiff to experience firsthand the victim's injuries or suffering or both.[3] The Court of Appeals did not erroneously consider the distance from which Mr. Colbert saw his daughter's body, and the court did not require that a plaintiff must be physically present at the time of the accident, i.e., it did not disregard *Hegel* in this regard.

¶34 Mr. Colbert also argues that the Court of Appeals erroneously imposed a requirement that the plaintiff arrive "unwittingly" at the accident scene. The Court of Appeals listed this as a circumstance showing that Colbert failed to establish a duty of care on the part of Skier's Choice, noting that other jurisdictions have required the plaintiff to arrive unwittingly at the accident scene. *Colbert*, 132 Wn. App. at 935 (citing *Mazzagatti v. Everingham*, 512 Pa. 266, 516 A.2d 672 (1986); *Nat'l County Mut. Fire Ins. Co. v. Howard*, 749 S.W.2d 618 (Tex. Ct. App. 1988)). Colbert instead knew before he left home that his daughter had disappeared in the lake and could not be located and thus did not arrive unwittingly at the scene.

¶35 That a bystander plaintiff must arrive on the scene unwittingly in order to maintain a cause of action for negligent infliction of emotional distress is the logical extension of our case law. As the court in *Mazzagatti*, 512 Pa. at 279-80, explained,

> where the close relative is not present at the scene of the accident, but instead learns of the accident from a third party,

---

[3] Mr. Colbert relies in part on *Corrigal v. Ball & Dodd Funeral Home, Inc.*, 89 Wn.2d 959, 577 P.2d 580 (1978), where the court held that the plaintiff had stated a cause of action for negligent infliction of emotional distress based on the fact a funeral home mishandled her son's remains with the result being that she unknowingly put her hand into his cremated remains, not realizing what they were. But in *Corrigal* the plaintiff was physically present and actually felt her son's remains as a result of the funeral home's negligence. Moreover, *Corrigal* was decided shortly after *Hunsley* and before *Gain* and *Hegel*, at a time when this court tested a claim of negligent infliction of emotional distress only against the general elements of a tort claim and no more. As explained, *Gain* and *Hegel* placed limits on liability for negligent infliction of emotional distress that were not imposed in *Hunsley*, and these limits were not considered in *Corrigal*. *Hunsley* no longer controls with regard to requirements for a claim of negligent infliction of emotional distress.

the close relative's prior knowledge of the injury to the victim serves as a buffer against the full impact of observing the accident scene. By contrast, the relative who contemporaneously observes the tortious conduct has no time span in which to brace his or her emotional system. The negligent tortfeasor inflicts upon this bystander an injury separate and apart from the injury to the victim . . . . [T]he critical element for establishing such liability is the contemporaneous observance of the injury to the close relative. Where, as here, the plaintiff has no contemporaneous sensory perception of the injury, the emotional distress results more from the particular emotional makeup of the plaintiff rather than from the nature of defendant's actions.

(Citation omitted.) We agree with the Pennsylvania court's reasoning. Whether the plaintiff arrived on the scene of the accident unwittingly is an appropriate consideration when determining whether he or she can bring a bystander negligent infliction of emotional distress claim based on the emotional trauma that results from experiencing another person's negligently inflicted physical injury. This comports with our prior case law that limits the cause of action to those who suffer emotional trauma from the shock caused by personally experiencing the immediate aftermath of an especially horrendous event that is in actuality a continuation of the event. As we observed in *Hegel*, 136 Wn.2d at 130 (quoting *Gates*, 719 P.2d at 199), " '[t]he kind of shock the tort requires is the result of the immediate aftermath of an accident.' " It is not the emotional distress one experiences at the scene after already learning of the accident before coming to the scene. As we have also emphasized, negligent infliction of emotional distress is a limited tort theory of recovery.

¶36 We hold that the Court of Appeals properly considered the fact that Mr. Colbert did not arrive on the scene unwittingly.

¶37 Mr. Colbert also contends that the Court of Appeals erroneously imposed a requirement that the plaintiff be physically present at the scene of the accident before

emergency personnel arrive, and argues that availability of the tort should not depend on a race to the scene. We agree.

¶38 The Court of Appeals reasoned that the court's adoption in *Hegel* of the "shortly thereafter" standard is like New Mexico's requirement that the plaintiff have a " 'contemporaneous sensory perception' of the accident and observation of the injured person *before* emergency professionals arrive." *Colbert*, 132 Wn. App. at 930 (quoting *Gabaldon v. Jay-Bi Prop. Mgmt. Inc.*, 1996-NMSC-55, 122 N.M. 393, 396-97, 925 P.2d 510). In *Gabaldon*, the plaintiff was the mother of a boy who nearly drowned at an amusement park. She received a call saying that a wave had taken her son, and a co-worker quickly drove her to the park where they found her son under the care of paramedics and being raised onto a stretcher and into an ambulance. *Gabaldon*, 122 N.M. at 393-94. She thought he had died and became hysterical. The court rejected her claim of negligent infliction of emotional distress under a New Mexico rule that liability for third party emotional distress is limited to " 'contemporaneous sensory perception of the accident.' " *Id.* at 397. The court held that the "contemporaneous perception" requirement is not satisfied if the plaintiff observes the scene after emergency medical personnel arrive, because the shock of seeing efforts to save a life in an ambulance or hospital is the kind of life experience that all will be expected to endure. *Id.* (citing and quoting *Bowen v. Lumbermens Mut. Cas. Co.*, 183 Wis. 2d 627, 517 N.W.2d 432, 444-45 (1994)).

¶39 In affirming the trial court, the Court of Appeals said that the fact that Colbert arrived only after many rescuers were already present and searching showed he could not meet the "shortly thereafter" requirement as a matter of law.

¶40 But *Gabaldon*'s requirement that the plaintiff be present before emergency personnel arrive is not consistent with our cases defining the "shortly thereafter" requirement. Depending on the facts of the case, the presence of emergency personnel does not necessarily foreclose a plain-

tiff's observations of "an injured relative at the scene of an accident after its occurrence and before there is substantial change in the relative's condition or location." *Hegel*, 136 Wn.2d at 132. This is because the presence of emergency personnel *may* not have materially altered the attendant circumstances and the plaintiff may be unaware that his or her loved one has been a victim of the accident. The New Mexico rule does not accord with *Hegel*. Accordingly, we disapprove of the Court of Appeals' reliance on the analysis in *Gabaldon*.[4]

¶41 Despite its reliance on *Gabaldon*, on the facts in this case the Court of Appeals correctly concluded that when Colbert observed the scene conditions were significantly changed from those that existed at the time Denise suffered injury. He did not observe the "victim's injuries at the scene of [the] accident shortly after it occur[ed] and before there [wa]s material change in the attendant circumstances." *Id.* As *Hegel* explains, the essence of the tort is the shock resulting from an especially horrendous event. *Id.* at 130. Mr. Colbert did not suffer the trauma of seeing the accident or the suffering of his daughter. Instead, on these facts the emotional distress he experienced was related to viewing the rescue efforts, the stress of waiting and watching and then having his worst fears confirmed, and the shock that is always attendant to a vital, healthy loved one's sudden, unexpected death. Mr. Colbert was an unforeseeable plaintiff as a matter of law under *Gain* and *Hegel*.

¶42 We affirm the Court of Appeals' conclusion that as a matter of law Mr. Colbert has failed to show he can meet the legal requirements for a claim for negligent infliction of

---

[4] Mr. Colbert also complains that the Court of Appeals erroneously followed *Cunningham*, which, he says, was rejected in *Hegel*. He urges us to expressly overrule *Cunningham*. As noted earlier, it is unnecessary to overrule *Cunningham* in this case as we have already done so in part. Moreover, we did approve *Cunningham*, in part, i.e., we agreed that *Hunsley* too broadly allowed for recovery under ordinary negligence principles, and accordingly limited the cause of action by restricting foreseeability through a narrowing definition of what it means to be present at the scene or arrive shortly thereafter.

emotional distress. Because we reach this conclusion, we do not reach the issue whether Mr. Colbert presented sufficient evidence of emotional distress.

## CONCLUSION

¶43 The trial court properly granted summary judgment dismissing Mr. Colbert's claim for negligent infliction of emotional distress because he cannot meet the requirement that he was present at the scene either at the time of the accident or "shortly thereafter" as we have defined this term. Mr. Colbert did not observe his daughter's injuries shortly after they occurred or before there was a material change in the attendant circumstances, and he did not see the accident or his daughter suffering.

¶44 The kind of shock the tort requires is, as we have held, " 'the result of the immediate aftermath of an accident. It may be the crushed body, the bleeding, the cries of pain, and, in some cases, the dying words.' " *Hegel*, 136 Wn.2d at 130 (quoting *Gates*, 719 P.2d at 199). Accordingly, as a matter of law Mr. Colbert was not a foreseeable plaintiff. We affirm the Court of Appeals. Summary judgment was properly granted in favor of Skier's Choice.

OWENS, FAIRHURST, and J.M. JOHNSON, JJ., and BRIDGE, J. PRO TEM., concur.

¶45 C. JOHNSON, J. (dissenting) — While the majority does not overrule or undermine any of our prior cases, it misapplies to the facts of this case the principles those cases established. In doing so, the majority errs in concluding that the plaintiff in this case was unforeseeable as a matter of law. The majority further misinterprets prior cases by emphasizing actual sensory experience of the victim's injuries and adopting an "unwitting" arrival requirement. While the majority correctly rejects a requirement that the plaintiff arrive before emergency personnel, on whether Jay Colbert arrived "shortly thereafter," the majority has erroneously interpreted and applied case law.

¶46 Contrary to the majority's finding, by explaining in *Hegel v. McMahon,* 136 Wn.2d 122, 960 P.2d 424 (1998), what it meant to arrive shortly thereafter, we did not dispose of ordinary tort principles respecting foreseeability. In *Hunsley v. Giard*, 87 Wn.2d 424, 553 P.2d 1096 (1976), the first case in our jurisdiction to allow a claim for negligent infliction of emotional distress (NIED), we based requirements on general tort principles of duty, breach, proximate cause, and damages. As a restriction on liability, we required objective symptomatology, and through subsequent case law, we stated a specific limitation on foreseeability by requiring the bystander NIED plaintiff be physically present when the accident occurs or arrive shortly thereafter.

¶47 Who is foreseeably endangered by defendant's conduct, however, has remained a question for the jury to determine, unless the court can conclude the plaintiff neither was present at the time of the accident nor arrived at the accident scene shortly thereafter. Based on this jurisprudence, after meeting the threshold requirement of presence at the accident scene shortly thereafter, like the plaintiffs in *Hegel*, Mr. Colbert should be afforded the right to have the issue of foreseeability go before the jury.

¶48 In concluding that Mr. Colbert did not arrive shortly thereafter, the majority ignores the purpose underlying our adoption of the tort—that the injury complained of must be a result of the trauma of visiting the accident scene, not ordinary grief for the loss of a loved one. In *Hegel*, we adopted an approach that focuses on the circumstances under which the observation is made: a family member who is not present when the accident occurs may nonetheless recover for emotional distress caused by observing an injured relative at the scene of the accident after its occurrence and before there is substantial change in the relative's condition or location. We identified, in *Hegel*, the class of claimants as those who are present at the scene before the horror of the accident has abated.

¶49 The majority errs in concluding that Mr. Colbert does not fall within this identified class of claimants. Mr. Colbert, like the plaintiffs in *Hegel*, arrived at the accident scene to observe the substantially unchanged accident circumstances. While the majority recognizes that Mr. Colbert arrived at the scene of the accident "within a chronologically short time of [his daughter's] death," it erroneously concludes, "at no time did [Mr. Colbert] personally experience conditions that can be said to be a continuation of ' "an especially horrendous event." ' " Majority at 57 (emphasis omitted) (quoting *Hegel*, 136 Wn.2d at 130 (quoting *Gates v. Richardson*, 719 P.2d 193, 199 (Wyo. 1986))). The majority's own description of the cause of Mr. Colbert's emotional distress refutes this point: "the emotional distress he experienced was related to viewing the rescue efforts, the stress of waiting and watching and then having his worst fears confirmed." Majority at 62. The majority draws an artificial distinction in stating the hours spent viewing ultimately futile rescue efforts did not qualify as horrendous attendant circumstances.

¶50 The majority equates the *Hegel* language of "witness" or "observe" in this case to seeing the victim's suffering and repeatedly emphasizes "actual sensory experience of the pain and suffering of the victim." Majority at 55-56. According to the majority, actual sensory experience of the victim's suffering may be seeing bleeding or other symptoms of injury, or hearing the victim's cries of pain, and, in some cases, the victim's dying words. Majority at 55. While actual sensory experience is one of the rationales for allowing those who arrive at an accident scene to claim NIED, it has never been a determinative factor under our cases.

¶51 The majority further misapplies case law by considering the distance from which a plaintiff sees the victim's suffering and quotes the Court of Appeals opinion, finding " 'the distance must be *close enough* for the plaintiff to experience traumatic shock from a *close-up view* of the loved one's agonizing injuries.' " Majority at 58 (emphasis

added) (quoting *Colbert v. Moomba Sports, Inc.*, 132 Wn. App. 916, 934 n.12, 135 P.3d 485 (2006)). By so limiting bystander NIED, the majority effectively precludes analogous situations where the plaintiff meets all *Hegel* requirements, including " 'observing an injured relative.' " Majority at 58 (emphasis omitted) (quoting *Hegel*, 136 Wn.2d at 132).

¶52 The dictionary defines "observe" as "to see or *sense . . . to come to realize or know.*" WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2345 (1986) (emphasis added). "Witness" is defined as "to see or *know by reason of personal presence* : *have direct cognizance of* : observe with one's own eyes or ears : be present as an observer at : experience by personal observation—used esp. of something . . . of more than ordinary significance." WEBSTER'S, *supra,* at 2627 (emphasis added).

¶53 The majority's narrow application of "witness" or "observe" in this case to mean only a "closeup" view of injuries, disregards instances where a plaintiff's view is obscured by a veil of water or fire, yet the plaintiff has come to realize or know, or to have direct cognizance of their loved one's serious injuries or suffering. Analogous cases from other jurisdictions recognize this factor as being broader than the majority's approach. *See, e.g., Landreth v. Reed*, 570 S.W.2d 486, 490 (Tex. Civ. App. 1978) (upholding plaintiff's NIED award though she did not observe her infant sister's drowning, but the resuscitative attempts, reasoning that actual observance of the accident is not required if there is instead an "experiential perception of it"); *see also Ruttley v. Lee*, 99-1130 (La. App. 5 Cir. 5/17/00), 761 So. 2d 777 (upholding bystander damage award for mother who arrived at traffic accident scene before her daughter's body was removed from the car, but who never saw her daughter's body as the car was covered with a canvas and police did not allow the mother to go to the car), *writ denied*, 2000-1781 (La. 9/22/00), 768 So. 2d 1287; *In re Air Crash Disaster,* 967 F.2d 1421 (9th Cir. 1992) (upholding recovery for NIED where plaintiff's husband

and two children perished when an airplane crashed into her home engulfing it in flames; plaintiff did not witness the plane crash, but returned several minutes after, was present at the scene of the fire, and was aware the fire was injuring her family); *Wilks v. Hom*, 2 Cal. App. 4th 1264, 3 Cal. Rptr. 2d 803 (1992) (upholding recovery for NIED where mother of children was contemporaneously aware that an explosion caused injuries to her children, though she did not actually see or hear them being injured); *Zuniga v. Hous. Auth.*, 41 Cal. App. 4th 82, 48 Cal. Rptr. 2d 353 (1995) (permitting plaintiff's NIED claim based on his seeing emergency personnel futilely attempt to rescue his family members from a burning building and the body of his daughter carried out of the building). The approach from these cases should be applied here.

¶54 The majority unnecessarily and arbitrarily extends our case law by adding an "unwitting" arrival requirement to the *Hegel* definition of arriving shortly thereafter. Though the plaintiffs in *Hegel* all happened upon the scene of the accident, there we did not recognize an unwitting arrival requirement, nor should we here.

¶55 The majority's reliance on out-of-state case law is misplaced. Principally, the majority cites to *Mazzagatti v. Everingham*, 512 Pa. 266, 516 A.2d 672 (1986), to support adoption of an unwitting arrival requirement. In *Mazzagatti*, the plaintiff arrived at the scene minutes after being informed her daughter was in an accident. The court noted in dictum that prior knowledge of injury to the victim served as a buffer against the full impact of observing the accident scene. *Mazzagatti*, 512 Pa. at 279. But essential to the holding and in accord with prior case law was the requirement that the bystander NIED plaintiff contemporaneously observe the accident. Indeed, the *Mazzagatti* court rejected the NIED claim based on arriving at the scene shortly after the accident's occurrence. In contrast, our recognition of bystander NIED is based on the trauma from observing the accident scene in all its alarming detail, whether the plaintiff was present to observe the injury-causing event or arrived shortly thereafter.

¶56 In *Hegel*, we determined that allowing recovery only to those who were present at the time of the injury-causing event created an arbitrary distinction; likewise, it is an arbitrary distinction to constrict the class of claimants only to those who unwittingly arrive upon the scene of the accident.[5]

¶57 Mr. Colbert witnessed the aftermath of the accident in all its alarming detail. He arrived within minutes of a 911 call to an accident scene complete with police cars, ambulances, and the fire department. He hoped his daughter would be found alive. He watched for hours and finally saw his daughter's body being pulled over the side of a boat by her arm. On these facts, the shock Mr. Colbert experienced was not "the shock that is *always attendant* to a vital, healthy loved one's sudden, unexpected death." Majority at 62 (emphasis added).

¶58 Because Mr. Colbert was present at the accident scene, and may have come to realize or know of his daughter's suffering before there was a substantial change in her condition or location, his mental distress should not be unforeseeable as a matter of law. Whether his mental distress was indeed foreseeable is a question of fact for the jury to decide. For these reasons, I dissent.

ALEXANDER, C.J., and CHAMBERS, J., concur with C. JOHNSON, J.

---

[5] Other jurisdictions have not recognized an unwitting arrival requirement. *See, e.g., Ruttley*, 761 So. 2d at 782 (upholding bystander NIED damage award where mother arrived at the scene of the accident after receiving a call that her daughter had been in an accident).