# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| BRETT HAMILTON, a single individual, | No. 50570-3-II |
| Appellant, | |
| v. | |
| KITSAP COUNTY, | UNPUBLISHED OPINION |
| Respondent. | |

MELNICK, J. — Brett Hamilton appeals from summary judgment in favor of Kitsap County on his claims of negligent supervision, negligent infliction of emotional distress (NIED), and retaliatory discharge. Hamilton argues the trial court erred in concluding no genuine dispute of any material fact existed on the negligent supervision claim or the retaliatory discharge claim. He also argues the trial court erred because it did not consider emotional damages when ruling on the NIED claim. We affirm.

## FACTS

### I. BACKGROUND

Hamilton worked as a corrections officer for the Kitsap County Sheriff's Office (KCSO) Corrections Division from 2002 to 2013. He received positive employee-performance reviews, and his employer recognized him as the corrections officer of the year in 2011. Hamilton had no disciplinary history prior to June 2012.

Corrections officers were members of the Kitsap County Correctional Officers Guild (Guild). A Collective Bargaining Agreement (CBA) governed the terms of employment for corrections officers. The CBA included appendix D, the Corrections Officer Bill of Rights (COBR), which provided, among other matters, rights afforded to corrections officers for administrative investigations that potentially involved disciplinary action. The COBR provided, in relevant part, that:

> In criminal matters, an employee shall be afforded those constitutional rights available to any citizen. In administrative matters . . . , [an employee] will be afforded the safeguards set forth in [the COBR].

Clerk's Papers (CP) at 327. As relevant here, the COBR provided that in certain administrative matters an employee must be provided the opportunity to consult with a Guild representative upon request and be questioned while "on duty or during the normal waking hours . . . unless the seriousness of the investigation require[d] otherwise." CP at 327-28.

Corrections Division procedures included the following. When detailing major infractions of the jail's rules, corrections officers had to submit a written incident report before their shift ended. When corrections officers suspected criminal conduct, they would write a report, and a shift supervisor would notify the Port Orchard Police Department (POPD) to conduct an independent criminal investigation. When the corrections officers reported non-criminal infractions, the shift supervisors would write on the report if they assigned a corrections officer to a follow-up investigation.

A.     Petitions

In the fall of 2011, Hamilton created two petitions entitled "Emergency Injunction." The petitions stated that the KCSO officers who signed the petitions had safety concerns about staffing levels during a particular shift.

Hamilton gave the petitions to Terry Cousins, the Guild president. Hamilton did not know what happened with the petitions, and he did not receive any feedback. Cousins gave the documents to an administrator in the Corrections Division. Cousins discussed the petitions with Ned Newlin, the Chief of the Corrections Division, on December 30, 2011.

B.      Jail Investigation

The Corrections Division used a company, Telmate, to manage inmate's phone calls and video visits. Inmates paid Telmate directly for the service. In March 2012, Corrections Sergeant Keith Hall e-mailed Telmate that inmates were receiving free remote-video visits because of a suspected software glitch. In the e-mail, Hall noted that Aaron Caseria, an inmate, had one of the highest number of free visits. Telmate replied that it did not want to seek payment for the free visits.

A few weeks later, Hamilton filed an incident report about Caseria exploiting the software glitch to get free video visits. The report contained Caseria's statement that he could not be blamed because the system could be manipulated. Sergeant Craig Dick, the shift supervisor, reviewed this incident report. Dick wrote on the report that Telmate was reviewing the issue. The Corrections Division did not ask Hamilton to follow up on the report.

Hamilton later spoke with Hall and Sergeant Anthony Glover about his incident report. Glover told Hamilton that he could continue to review Caseria's video visits on Telmate and write reports on his findings. Hamilton did not file any other incident reports related to Caseria's Telmate use.

C.      Text Messages

On one occasion, Hamilton saw Caseria's wife, Ashley,[1] using a Telmate account registered to Caseria's mother. Hamilton took down the phone number associated with the Telmate account and texted personal messages to Ashley saying, in part, how much he loved her. Hamilton used his son's phone for the texts because he believed it would not show a name on caller ID.

On June 9, 2012, Caseria's mother-in-law died, and Officer Kearney told Hamilton that Caseria found out about the death. Hamilton believed Caseria was lying about the death so he could be furloughed claiming he needed to attend the funeral. Hamilton could not find an obituary for Caseria's mother-in-law. He again texted Ashley, stating how much he loved her. He also called her number. Despite repeated requests, Hamilton never identified himself.

Ashley subsequently called 911 and reported Hamilton's calls and texts. The same day, Hamilton looked up Ashley in the Corrections Division records and saw a new criminal case number. He believed that Ashley had filed a police report about his texts and calls.

Hamilton told Officer Kearney and two other officers about the texts. The other officers expressed their concerns to Hamilton. Hamilton did not have concerns about getting caught because he used somebody else's phone. He did not tell anybody he was conducting an investigation.

Before Kearney's shift ended, Kearney told Dick that Hamilton admitted he texted Ashley. Dick then reported this information to Lieutenant Genie Elton. Neither Dick nor Elton authorized the text messages. Hamilton never discussed his plan to text Ashley with any supervisor. He also did not write an incident report about his actions.

---

[1] For purposes of clarity we use Ashley's first name. We intend no disrespect.

4

Elton met with Newlin and told him about Hamilton's texts. Newlin told Elton to report Hamilton's conduct to POPD so it could conduct an independent criminal investigation. Newlin also told Elton to have Sergeant Jim McDonough, of KCSO's Office of Professional Standards, check the Corrections Division's records to see if Hamilton had accessed Caseria's or Ashley's records. McDonough reported that Hamilton accessed Ashley's records on two occasions. Hamilton changed the address on file for Ashley on January 22, 2012, and had queried her name on June 10.

D.     Criminal Investigation

POPD had discretion to investigate whether Hamilton acted criminally. The Corrections Division did not have control over POPD's criminal investigation. POPD assigned Detective E.J. Martin to investigate the criminal complaint against Hamilton relating to the text messages.

Elton told Martin that she preferred he interview Hamilton about the text messages away from the Kitsap County Jail. She wanted to avoid workplace disruptions and ensure that Hamilton did not feel that the Corrections Division was pressuring him to incriminate himself. Martin agreed and decided to interview Hamilton at Hamilton's home.

On June 16, Martin went to Hamilton's home. Martin displayed his badge, and Hamilton agreed to speak with Martin. Hamilton repeatedly denied texting Ashley. Two days later, Payne reassigned Hamilton to administrative work because of the criminal investigation.

On June 19, Hamilton contacted Cousins for advice from the Guild. Hamilton admitted to Cousins that he had lied to Martin about the text messages. Cousins told Hamilton to write a truthful statement and give it to Martin.

Hamilton met with Martin and gave him a sworn written statement admitting he sent the texts. In the statement, Hamilton claimed that the texts were part of a follow-up investigation into Caseria's Telmate use. Hamilton told Martin that he lied because he was afraid and did not know if he should talk to Martin.

Shortly thereafter, Newlin told Elton to notify the Bremerton Police Department (BPD) about Hamilton's conduct. Hamilton served as a volunteer reserve officer for BPD. BPD told Hamilton that he could not serve as a reserve officer while he was under investigation.

Ashley filed for a protection order against Hamilton. At a hearing on the order, Hamilton testified that he was conducting an investigation when he texted Ashley but admitted that he did not notify his supervisors. The presiding judge found that Hamilton's texts were harassing and sent without legal authority. The court granted Ashley a permanent protection order against Hamilton.

On August 28, the City of Port Orchard filed a criminal complaint based on POPD's investigation. The complaint charged Hamilton with telephone harassment and making a false statement to a public servant, Martin. Hamilton signed a pretrial diversion agreement in that case.

E.      Terminations

On March 26, 2013, KCSO terminated Hamilton for misconduct. In the termination letter, Newlin cited violations of KCSO policies, Civil Service Rules, the Corrections Division mission and core values, and Hamilton's oath of office as a corrections officer. Newlin stated that he had no faith in Hamilton's judgment, honesty, or ethics. He believed Hamilton could not effectively conform to standard operating procedures, testify on behalf of the Corrections Division, or represent the Corrections Division positively. The Guild did not seek arbitration even though the

CBA allowed for it. BPD subsequently terminated Hamilton from service as a volunteer reserve officer.

II.  PROCEDURAL FACTS

On March 24, 2016, Hamilton filed a complaint against the County alleging negligent supervision, NIED, and retaliation.[2]

He specified, in part, that the County "engaged in a course of conduct deliberately intended to cause injury to [his] reputation" which caused him physical harm and emotional distress. CP at 565. He also claimed the County retaliated against him because of his Guild-related activities relating to the petitions he submitted.

The County moved for summary judgment on the NIED and negligent supervision claims. Newlin filed a declaration in support of the motion, stating that Hamilton's untruthful statements to Martin and to the court about conducting an investigation when he sent Ashley the texts had the "most significant" impact on his decision to terminate Hamilton. CP at 43. Newlin stated he knew of the safety issues raised in Hamilton's petitions but did not know Hamilton prepared them.

Hamilton opposed summary judgment and filed a declaration from Cousins that she believed there was a "direct connection" between the petitions Hamilton submitted and his termination. CP at 346. In support, Cousins stated that she discussed the petitions with Newlin at a meeting on December 30, 2011, and that the petitions were "a source of irritation and embarrassment to the Administration," which Newlin "personally disliked having to address." CP at 499.

---

[2] On September 14, 2016, a federal court granted summary judgment to the County after Hamilton filed a complaint for a violation of 42 U.S.C. § 1983 and for breach of contract. Hamilton based both claims on allegations that the County violated his rights under the COBR.

The court granted summary judgment in favor of the County on the NIED and negligent supervision claims. It subsequently denied Hamilton's motion to reconsider the order.

The County later moved for summary judgment on the retaliation claim. The trial court granted it and then denied Hamilton's motion to reconsider the order. Hamilton appeals.

ANALYSIS

I.      STANDARD OF REVIEW

We review a grant of summary judgment de novo. *Bank of Am. NT & SA v. Hubert*, 153 Wn.2d 102, 111, 101 P.3d 409 (2004).

Summary judgment is proper when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." CR 56(c). "'A material fact is one that affects the outcome of the litigation.'" *Elcon Constr., Inc. v. E. Wash. Univ.*, 174 Wn.2d 157, 164-65, 273 P.3d 965 (2012) (quoting *Owen v. Burlington N. Santa Fe R.R.*, 153 Wn.2d 780, 789, 108 P.3d 1220 (2005)). We view facts, and reasonable inferences therefrom, in the light most favorable to the nonmoving party. *Briggs v. Nova Servs.*, 166 Wn.2d 794, 801, 213 P.3d 910 (2009).

"The moving party bears the burden of showing the absence of a material issue of fact." *Steinbock v. Ferry County. Pub. Util. Dist. No. 1*, 165 Wn. App. 479, 484-85, 269 P.3d 275 (2011). "[A]fter the moving party submits adequate affidavits, the nonmoving party must set forth specific facts that sufficiently rebut the moving party's contentions and disclose that a genuine issue as to a material fact exists." *Seven Gables Corp. v. MGM/UA Entm't Co.*, 106 Wn.2d 1, 13, 721 P.2d 1 (1986). The nonmoving party "may not rely on speculation, argumentative assertions that

unresolved factual issues remain, or in having its affidavits considered at face value." *Seven Gables Corp.*, 106 Wn.2d at 13. "Broad generalizations and vague conclusions are insufficient to resist a motion for summary judgment." *Thompson v. Everett Clinic*, 71 Wn. App. 548, 555, 860 P.2d 1054 (1993).

"A complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Repin v. State*, 198 Wn. App. 243, 262, 392 P.3d 1174, *review denied*, 188 Wn.2d 1023 (2017); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

III.    NEGLIGENT SUPERVISION

Hamilton argues that the County negligently supervised Elton, Newlin, and McDonough. He contends a genuine dispute exists as to material facts regarding whether Elton, Newlin, and McDonough acted outside the scope of their employment by asking Martin to interview him while he was off duty, before he had notice of POPD's criminal investigation.[3] We disagree.

An allegation of negligent supervision can take the form of a stand-alone claim or as a means of establishing vicarious liability. *See Niece v. Elmview Grp. Home*, 131 Wn.2d 39, 48, 51, 929 P.2d 420 (1997). Here, Hamilton asserts it as a stand-alone claim.

A plaintiff alleging a stand-alone negligent supervision claim must prove that: (1) the defendant's employee acted outside the scope of his or her employment; (2) "the employee presented a risk of danger to others"; (3) the employer knew, or should have known, about the

---

[3] There is nothing in the CBA that mandates Hamilton receive advance notice of a criminal investigation.

tortious employee's dangerous tendencies; and (4) that the employer's failure to supervise was the proximate cause of the injuries suffered. *Evans v. Tacoma Sch. Dist. No. 10*, 195 Wn. App. 25, 47, 380 P.3d 553 (2016); *see Niece*, 131 Wn.2d at 48-49, 52; *Briggs v. Nova Servs.*, 135 Wn. App. 955, 966-67, 147 P.3d 616 (2006).

Whether employees were acting within the scope of employment depends on whether they were "fulfilling [their] job functions at the time [they] engaged in the injurious conduct." *Robel v. Roundup Corp.*, 148 Wn.2d 35, 53, 59 P.3d 611 (2002). Employees are not "fulfilling [their] job functions when [their] 'conduct is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.'" *Anderson v. Soap Lake Sch. Dist.*, 191 Wn.2d 343, 361-62, 423 P.3d 197 (2018) (internal quotation marks omitted) (quoting *Robel*, 148 Wn.2d at 53).

Here, the County's employees acted within the scope of their employment when they asked Martin to interview Hamilton while he was off-duty and before he had notice of the criminal investigation. Corrections Division procedures required that its employees report suspected criminal conduct occurring in the Kitsap County Jail to POPD for an independent criminal investigation. While on duty, Hamilton sent harassing texts to Ashley. Because Elton and Newlin suspected criminal conduct by Hamilton, they acted in the scope of their employment when they reported his conduct.

Furthermore, as relevant here, the COBR only provided that corrections officers receive the procedural safeguards, or rights, contained therein when they were the subject of certain administrative investigations. In criminal investigations, the COBR did not provide procedural safeguards beyond "those constitutional rights available to any citizen." CP at 327. We note that even in administrative investigations, the COBR only provided that investigators should question

corrections officers while the officers were "on duty or during the normal waking hours . . . unless the seriousness of the investigation require[d] otherwise." CP at 328. As such, the COBR did not mandate that all administrative interviews occur while a corrections officer was on-duty.

Viewing the undisputed facts in the light most favorable to Hamilton, the County's employees acted within the scope of their employment. Alleged COBR violations formed the sole basis for Hamilton's argument that the County's employees acted outside the scope of their authority. Hamilton failed to produce evidence sufficient to create a genuine dispute over whether the County's employees exceeded the scope of their employment, an essential element of his negligent supervision claim.[4] Accordingly, the superior court properly granted the County's summary judgment motion dismissing the negligent supervision claim.

IV.    NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (NIED)

Hamilton argues that his NIED claim extended beyond employment-related emotional damages. Hamilton contends that the damages he alleged under the NIED claim are unrelated to his wrongful employment termination, including financial stress caused because he could not meet financial obligations made by his wife and reliance on his mother to meet living expenses. Therefore, according to Hamilton, the trial court erred by dismissing his NIED claim. We disagree.

"The tort of negligent infliction of emotional distress is a limited, judicially created cause of action." *Colbert v. Moomba Sports, Inc.*, 163 Wn.2d 43, 49, 176 P.3d 497 (2008). A plaintiff may recover for negligent infliction of emotional distress by proving "duty, breach, proximate cause, damage, and 'objective symptomatology.'" *Kumar v. Gate Gourmet, Inc.*, 180 Wn.2d 481, 505, 325 P.3d 193 (2014) (quoting *Strong v. Terrell*, 147 Wn. App. 376, 387, 195 P.3d 977 (2008)).

---

[4] Because we conclude the County's employees acted within the scope of their employment, an essential element of Hamilton's negligent supervision claim, we need not address the remaining elements.

11

In other words, the plaintiff must have been a foreseeable plaintiff, who reasonably suffered emotional distress, caused by the negligent conduct of the defendant, and confirmed by objective symptomatology. *Kumar*, 180 Wn.2d at 505; *Bylsma v. Burger King Corp.*, 176 Wn.2d 555, 560, 293 P.3d 1168 (2013); *Colbert*, 163 Wn.2d at 49; *Repin*, 198 Wn. App. at 263-64.

A negligent infliction of emotional distress claim cannot rest on allegations that the defendant intended to inflict emotional distress on the plaintiff. *St. Michelle v. Robinson*, 52 Wn. App. 309, 315-16, 759 P.2d 467 (1988); *cf. Rodriguez v. Williams*, 107 Wn.2d 381, 384, 387, 729 P.2d 627 (1986). A defendant must have negligently or recklessly caused the plaintiff emotional distress to be liable for NIED. *St. Michelle*, 52 Wn. App. at 316.

Because there is no negligence associated with the NIED claim, and only an intentional act, the superior court properly granted the County's summary judgment motion on the NIED claim.

V.      RETALIATORY DISCHARGE

Hamilton argues that a genuine dispute exists as to material facts regarding whether the petitions he created in 2011 were a substantial factor in Newlin's decision to terminate him. He contends that RCW 49.17.160 and WAC 296-360-100 protect him from retaliation based on the petitions because they reported workplace safety concerns. Hamilton argues that a genuine dispute exists because he produced evidence of his positive performance reviews, his recognition as officer of the year in 2011, and evidence of the circumstances surrounding Martin's interview. Thus, Hamilton argues that because factual disputes remain, the trial court erroneously granted the County's summary judgment motion. We disagree.

"To establish a prima facie case of retaliation . . . , a plaintiff must show that (1) he or she engaged in statutorily protected activity, (2) he or she suffered an adverse employment action, and (3) there was a causal link between his or her activity and the other person's adverse action." *Currier v. Northland Servs., Inc.*, 182 Wn. App. 733, 742, 332 P.3d 1006 (2014).[5] After an employee establishes his or her participation in a statutorily protected activity and an adverse employment action occurs, evidence that the employer knew of the protected activity before the adverse employment action is sufficient to show causation, and "a rebuttable presumption of retaliation arises that precludes summary dismissal of the case." *Currier*, 182 Wn. App. at 747.

"[T]he defendant may rebut the claim by presenting evidence of a legitimate nondiscriminatory reason for the adverse action." *Currier*, 182 Wn. App. at 743. If the defendant produces evidence of a legitimate nondiscriminatory reason for the termination, summary judgment is proper unless the plaintiff comes forth with evidence that the defendant's reason is mere pretext for a retaliatory motive. *Currier*, 182 Wn. App. at 743. "An employee may prove the employer's reasons were pretextual 'either directly by persuading the court that a

---

[5] We are not convinced that the parties utilized the correct test. The cases that apply this three-part test all involve claims of retaliatory discharge under Washington's Law Against Discrimination (WLAD), RCW 49.60.210(1). Because Hamilton alleges that the County discharged him, in part, because he created safety-related petitions protected under the Washington Industrial Safety and Health Act of 1973 (WISHA), RCW 49.17.160, it appears the correct framework is the four-part test enunciated in *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 232-33, 685 P.2d 1081 (1984), and refined by *Wilmot v. Kaiser Aluminum & Chemical Corp.*, 118 Wn.2d 46, 821 P.2d 18 (1991). *See Martin v. Gonzaga Univ.*, ___Wn.2d___, 425 P.3d 837, 842-45 (2018) (applying the *Thompson* and *Wilmot* analysis when plaintiff "allege[d] that he was fired in retaliation for voicing safety complaints"). An analysis of the four-part test would also result in the same conclusion at which we have arrived. Hamilton would not prevail.

discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Estevez v. Faculty Club of the Univ. of Wash.*, 129 Wn. App. 774, 800, 120 P.3d 579 (2005) (internal quotation marks omitted) (quoting *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998).

Here, the County's legitimate nondiscriminatory reason for firing Hamilton was its loss of faith in a corrections officer who harassed an inmate's wife and lied to public servants. Newlin filed a declaration stating that Hamilton's untruthful statements to Martin and to the court during the protection order hearing had the "most significant" impact on his decision to terminate Hamilton. CP at 43. Hamilton did not produce evidence that the petitions were the more likely motivation for his termination or that the County's legitimate nondiscriminatory reason was unworthy of credence.

Thus, even assuming that Hamilton has set forth a prima facie case by meeting each of the three elements for retaliatory discharge, the County still prevails because it put forth a legitimate nondiscriminatory reason for terminating Hamilton, and Hamilton put forth no evidence that the County's reason is mere pretext for a retaliatory motive. *Currier*, 182 Wn. App. at 743. Accordingly, the superior court properly granted the County's summary judgment motion.

The County asks for an award of costs pursuant to RAP 14.2 as the substantially prevailing party on review. We award the County the costs allowed by RAP 14.2 upon its compliance with RAP 14.4.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

                                                      Melnick, J.

We concur:

Worswick, P.J.

Johanson, J.